*Supp. 10 Opinion
COOPERMAN, J.—
Statement of Case and Procedural History
On February 1, 1983, a misdemeanor complaint was filed against defendant charging him with violation, on or about January 25, 1983, of Health and Safety Code section 11364.7, subdivision (a), which proscribes the delivery, furnishing or transfer of drug paraphernalia, or the possession or manufacture with intent to deliver, furnish or transfer of drug paraphernalia.[1]
*Supp. 11 On February 9, 1983, defendant filed a written demurrer to the complaint, under Penal Code section 1004, subdivision 4, on the ground that the facts set forth therein did not constitute a public offense in that Health and Safety Code section 11364.7 “. . . is unconstitutionally violative of due process, free speech, and equal protection” under the federal and state constitutions.
On the same date, defendant filed a motion for return of personal property seized by the People, from the Music Odyssey, 11910 Wilshire Boulevard, Los Angeles, California, of which defendant was manager, to suppress said personal property as evidence, under Penal Code section 1538.5, and to quash and traverse the search warrant previously issued and relating to the Music Odyssey.
On February 15, 1983, the trial court overruled defendant’s demurrer to the complaint.
On February 18, 1983, following a hearing, the trial court granted defendant’s suppression motion, ordered the case dismissed under Penal Code *Supp. 12 section 1385,[2] and ordered the personal property, which had been seized, returned to the legal owner thereof, Music Odyssey, Inc.
The People filed a timely notice of appeal on February 18, 1983, and, on February 24, 1983, obtained from this court an order staying the order for return of the personal property, pending appeal.
Statement of Facts
At the outset of the hearing on February 18, 1983, under the provisions of Penal Code section 1538.5, the People indicated that they would seek to justify the seizure of the purported drug paraphernalia, as a seizure of contraband in plain view, rather than under the search warrant that had theretofore been issued.[3]
In the foregoing context, the People offered the testimony of Officer James M. Steele of the Los Angeles Police Department in order to satisfy their burden as to the legality of the seizure.
In the course of qualifying Officer Steele as an expert witness, he testified that he had been a police officer for the City of Los Angeles for approximately seventeen and one-half years, and is presently assigned to the Narcotics Division, West Bureau; that he has been assigned to narcotics investigation for more than five years; that he has been qualified in the courts of this state as an expert in narcotics cases; that he has received training from the Los Angeles Police Department in the field of narcotics identification, usage, packaging, and shipping, and on the effects of narcotics on people who use them, and the ways that they are sold, legally and illegally; that he had taken courses in junior college on narcotics identification, and attended seminars conducted by the office of the district attorney, the sheriff’s office, and the Los Angeles Police Department on the subject of narcotics; that he had purchased narcotics in an undercover capacity for the Los Angeles Police Department; and had given classes at the Los Angeles Police Academy on narcotics, narcotics packaging and narcotics identification.
After stating that in the course of his experience he had had an opportunity to observe what is commonly referred to as drug paraphernalia, Officer Steele testified as follows:
“Q. Would you please relate to the court the various items that you consider to be drug paraphernalia?
*Supp. 13 “A. Drug paraphernalia runs a wide varity [.sic] of different items that are used basically for cutting, or ingesting, or preparing narcotics for ingestion or injection.
“For instance, there are what they call tooters, or coke spoons, small spoons, with which a person would take a quantity of coke on the end, and place it to their nose, and ingest it through the nasal passages.
“Also, there are straws that are used for the same purpose.
“They come in any kind of varity [sic], or sizes, or thing the person wants to use or purchase.
“There is cut for narcotics, like Mannitol, Mannite ‘White Lady’, ‘Supercut’.
“We can get into different chemicals, like ether. It is used also with P.C.P., or it can be in freebasing of cocaine.
“You have different types of papers that your drugs are sold in, cocaine or heroin.
“Small papers or small seals.
“There are a varity [szc] of plastic baggies on the market that are zip-loc, which are commonly used to package drugs in.
“There is scales of different sizes that are used for drug use.
“Also, there is sifters or grinders that assist them in preparing the drugs for use and sales.
“There would be a varity [szc] of different pipes—they call them bongs— made out of anything—wood, glass, plastic—to ingest your marijuana, or hashish, and cocaine.”
Officer Steele further testified that on January 25, 1983, between 11 and 11:30 a.m., he and six other officers entered the Odyssey to serve a search warrant. The store was open for business, with customers present.
Officer Steele testified that he observed in the store numerous items which he described as “drug paraphernalia” offered for sale from open shelves and glass-enclosed cases, open to plain view, which items were seized. Prior to such seizure, Steele stated that 10 photographs were taken of the *Supp. 14 cases and shelves . .to give everybody a good idea, or fair idea, of how everything was situated at the time we had entered into the Odyssey.”[4]
Steele also prepared a schematic diagram of the location of the 18 display cases and shelves in the Odyssey, which was received in evidence.
Following the seizure of the personal property involved in the case at bench, it was placed by the police in 13 lots (cardboard boxes), keyed to the store location (case or shelf) from which it was removed, as designated on the foregoing schematic diagram.
The personal property seized was also listed in a property report prepared by the police under DR #83-431705, which the parties stipulated set forth all of the personal property seized.
In essence, Officer Steele testified that the seizure occurred because defendant had committed a misdemeanor in his presence, namely violation of Health and Safety Code section 11364.7, subdivision (a), by offering items for sale which, in his expert opinion, were used, or intended to be used, with controlled substances. The People rested after the testimony of Officer Steele.[5]
As its first witness, the defense called Steve Allen who testified that in his presence certain plastic seals, plastic baggies, and scales were seized by the police from locked opaque cabinets under display cases referred to as No. 6 and No. 7 on the schematic diagram prepared by Officer Steele. Allen acknowledged that the police had also seized from cases No. 6 and No. 7 plastic seals, plastic baggies, and scales which were in plain view. He testified that he did not know how many of said items were in each category.
Defendant then testified. He stated that he was present when the police came to the Odyssey on January 25, 1983, and saw them search “several things that were locked.” He testified specifically that he observed an officer remove “items,” from a locked portion of case No. 5 (per the schematic diagram), which was not in “open view to the public.” Defendant stated that the officer “. . . took out items underneath the case, which was—I would estimate, is probably a quarter or a half as much as what was above, or in view.”
*Supp. 15 Defendant testified that case No. 5 was a vitamin and food additive section, but could not give an accounting of what items were seized from below in the area that was not open to public view, other than to state that “. . . it was approximately one-fourth of what was there on the top.”
The final witness to testify on behalf of defendant was Jeffrey Scott Balin, an employee of the Music Odyssey.
He testified that he had seen the police seize containers of ether which were located in the chemical counter, case No. 3, in an area not visible to the public.
Balin was shown People’s exhibit 10, which is a photograph of nine cans of ether and two bottles of ether, and testified that such a display of ether as was depicted in exhibit 10 did not exist in the store. He further testified that the ether that had been out of sight in case No. 3, the chemical counter, was no longer present when the officers left the establishment following their seizure of personal property.[6]
The court also received in evidence on behalf of defendant the February 23, 1981, version of Senate Bill No. 341, which became section 11014.5 and section 11364.7 of the Health and Safety Code.
The Order of the Trial Court
Following the taking of testimony and argument by counsel, the trial judge gave his findings and order as follows:
“This was conceded by the People, not to be a search within the meaning of the Fourth Amendment. And it was conceded they were not acting on the basis of a valid search warrant.
“The court finds that some of the objects seized were concealed from plain view.
“The officer has a right to the plain view, and the plain view was achieved by walking into the store and observing those items that were open to the public.
*Supp. 16 “But, based on the evidence before the court, the court is of the opinion that items were also seized which were not—which were concealed from plain view.” These items were not taken pursuant to either a valid arrest or a search warrant.
“There were also items seized that were excluded from the—under the statute. And the items seized also were comingled; and this court has no way to determine what was legally taken and what was not.
“And the motion to suppress is granted.” (Italics added.)
Contentions on Appeal
Appellant raises the following basic contentions in connection with the assertion that the ruling of the trial court should be reversed:
1. The conclusion of the trial court that items which are not specifically listed in Health and Safety Code section 11014.5, in which the term “drug paraphernalia” is defined, cannot legally be seized, even if in plain view, is erroneous; and
2. The trial court erred in suppressing all of the items of the evidence seized, because a small number of such items may not have been in plain view.
Discussion
Our analysis of the trial court’s suppression ruling discloses that it was based on the following findings: The trial court found that certain items were illegally seized for the reason that those items were either not in plain view or they were “excluded” by the Legislature from the definition of “drug paraphernalia,” as evidenced by the February 23, 1981, version of Senate Bill No. 341, which became, in pertinent part, section 11014.5 of the Health and Safety Code, which defines “drug paraphernalia.” The trial court also found that certain items were properly seized for the reason that they were in plain view and were specifically enumerated as “drug paraphernalia” in section 11014.5, subdivision (a). It made no finding identifying specifically which of the seized items were in plain view, which were not in plain view, and which did not fall within its definition of “drug paraphernalia.” Instead, the trial court suppressed all the seized items after making the further finding that since the properly seized items were “commingled” with items illegally seized, i.e., items not within its definition of “drug paraphernalia” or items not in plain view, it could not determine “what was legally taken and what was not.”
*Supp. 17 We conclude that the suppression ruling is erroneous in two significant respects. Initially, we find that the trial court erred in its interpretation of what constitutes “drug paraphernalia” under Health and Safety Code section 11014.5. We also find that the trial court erred by failing to make specific findings as to which of the seized items were properly seized and which were not.
In finding that certain items were “excluded” from the definition of “drug paraphernalia” the trial court focused on the fact that those items had been expressly enumerated but subsequently stricken from the February 23, 1981, version of Senate Bill No. 341.[7] It reasoned that this meant that the Legislature intended the definition of “drug paraphernalia” to encompass only those expressly enumerated items which were not stricken.
We disagree. The trial court misconstrued the significance of the stricken items. The plain language of Health and Safety Code section 11014.5 emphatically refutes its conclusion that the definition of “drug paraphernalia” is limited to those items specifically listed in subsections (1) through (8) of subdivision (a) of that section.
The term “drug paraphernalia” in fact “means all equipment, products and materials of any kind which are designed for use or marketed for use, in . . . ingesting ... or otherwise introducing into the human body a controlled substance .... It includes, but is not limited to: [the specific items set forth in subdivision (a), subsections (1) through (8)].” (Health & Saf. Code, § 11014.5, subd. (a), italics added.)
The clear import of the phrase “but is not limited to” signifies that the Legislature intended the definition of “drug paraphernalia” to be expansive and flexible. Thus, the expressly enumerated items are simply exemplary *Supp. 18 of those items which may constitute “drug paraphernalia” rather than delineating the parameters of the subject.[8]
We also reject, as unsupported by the record, the trial court’s finding that it could not determine “what was legally taken and what was not” for the reason that the properly seized items were “commingled” with the items illegally seized. At first glance the task appears to be formidable in view of the numerous items seized. We note that there are no reported decisions which offer guidance to a trial court which is confronted with a motion to suppress a large number of diverse items claimed to be “drug paraphernalia.” Nonetheless, when the items have been segregated into lots according to where they were seized, the task is neither hopeless nor impossible. Apparently, those items not in plain view constitute a relatively small number of the total seized.[9] We therefore conclude that the “commingling” in the present case does not excuse the trial court from its duty to make specific findings as to those items which must be suppressed. (People v. Superior Court (Arketa) (1970) 10 Cal.App.3d 122, 126 [89 Cal.Rptr. 316].)
These errors mandate the reversal of the suppression order and the attendant orders and compel remand of the matter for further proceedings. On remand it is incumbent on the trial court to determine which of the seized items were in plain view, which were not, and which fall within the parameters of “drug paraphernalia,” as defined by Health and Safety Code section 11014.5, and to make appropriate findings in that regard.[10]
*Supp. 19 The suppression order, the order of dismissal, and the order for return of personal property are reversed, and the matter is remanded with directions that further proceedings be taken, including the taking of additional evidence, if necessary, in conformity with this opinion.[11]
Reese, P. J., and Bernstein, J., concurred.

 The plain purpose of the drug paraphernalia statutes is to eliminate the use and sale of such items.
Health and Safety Code section 11364.7, subdivision (a), enacted in 1982 provides: “(a) It is a misdemeanor for any person to deliver, furnish, or transfer, or to possess with intent to deliver, furnish, or transfer, or to manufacture with intent to deliver, furnish, or transfer, drug paraphernalia, knowing, or under circumstances where one reasonably should know, that it will be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this division.”
Health and Safety Code section 11014.5, as enacted in 1982, defines “drug paraphernalia” as follows:
“(a) “Drug paraphernalia” means all equipment, products and materials of any kind which are designed for use or marketed for use, in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance in violation of this division. It includes, but is not limited to:
“(1) Kits designed for use or marketed for use in planting, propagating, cultivating, growing, or harvesting of any species of plant which is a controlled substance or from which a controlled substance can be derived.
“(2) Kits designed for use or marketed for use in manufacturing, compounding, converting, producing, processing, or preparing controlled substances.
“(3) Isomerization devices designed for use or marketed for use in increasing the potency of any species of plant which is a controlled substance.
“(4) Testing equipment designed for use or marketed for use in identifying, or in analyzing the strength, effectiveness, or purity of controlled substances.
“(5) Scales and balances designed for use or marketed for use in weighing or measuring controlled substances.
“(6) Containers and other objects designed for use or marketed for use in storing or concealing controlled substances.
“(7) Hypodermic syringes, needles, and other objects designed for use or marketed for use in parenterally injecting controlled substances into the human body.
“(8) Objects designed for use or marketed for use in ingesting, inhaling, or otherwise introducing marijuana, cocaine, hashish, or hashish oil into the human body, such as:
“(A) Carburetion tubes and devices.
“(B) Smoking and carburetion masks.
“(C) Roach clips, meaning objects used to hold burning material, such as a marijuana cigarette, that has become too small or too short to be held in the hand.
“(D) Miniature cocaine spoons, and cocaine vials.
*Supp. 11 “(E) Chamber pipes.
“(F) Carburetor pipes.
“(G) Electric pipes.
“(H) Air-driven pipes.
“(I) Chillums.
“(J) Bongs.
“(K) Ice pipes or chillers.
“(b) For the purposes of this section, the phrase “marketed for use” means advertising, distributing, offering for sale, displaying for sale, or selling in a manner which promotes the use of equipment, products, or materials with controlled substances.
“(c) In determining whether an object is drug paraphernalia, a court or other authority may consider, in addition to all other logically relevant factors, the following:
“(1) Statements by an owner or by anyone in control of the object concerning its use.
“(2) Instructions, oral or written, provided with the object concerning its use for ingesting, inhaling, or otherwise introducing a controlled substance into the human body.
“(3) Descriptive materials accompanying the object which explain or depict its use.
“(4) National and local advertising concerning its use.
“(5) The manner in which the object is displayed for sale.
“(6) Whether the owner, or anyone in control of the object, is a legitimate supplier of like or related items to the community, such as a licensed distributor or dealer of tobacco products.
“(7) Expert testimony concerning its use.
“(d) If any provision of this section or the application thereof to any person or circumstance is held invalid, it is the intent of the Legislature that the invalidity shall not affect other provisions or applications of the section which can be given effect without the invalid provision or application and to this end the provisions of this section are severable. [Stats. 1982 ch. 1278 § 1.]”
This statute is patterned after the Model Drug Paraphernalia Act (Model Act) drafted by the United States Department of Justice. In addition to California, the following states have adopted drug paraphernalia statutes based on the Model Act: Connecticut, Delaware, Florida, Indiana, Louisiana, Maryland, and New York. Versions of the Model Act have also been enacted in Colorado, Illinois, Nebraska, New Jersey, Pennsylvania, and South Carolina.

 The docket indicates as follows: “On defense motion to dismiss cause is dismissed pursuant to 1385 P.C. People unable to proceed.”

 In view of the posture of the People, no proceeding was conducted on defendant’s motion to quash and traverse the search warrant, which became moot.

 The 10 photographs were received in evidence by stipulation, and counsel for the parties further stipulated that the photographs represented a “fair representation” of the Odyssey establishment “. . . on the date of arrest, January 25, 1983.”

 Steele was recalled as a rebuttal witness on behalf of the People, following the conclusion of testimony on behalf of defendant.

 Officer Steele, on rebuttal examination, acknowledged that the ether containers depicted in People’s exhibit 10 “. . . were set up on top of the counter and photographed for labeling purposes.” He further testified that it was his recollection that some of the containers depicted in exhibit 10 had been removed from the open display portion of case No. 3.

 The enacted version of Senate Bill No. 341 struck from the included and express listing of items which constitute “drug paraphernalia,” as set out in Health and Safety Code section 11014.5, subdivision (a), the following items which had been listed in an earlier version of the bill: “Diluents and adulterants, such as Quinine, Hydrochloride, Mannitol, Mannite, Dextrose and Lactose, used, intended for use, or designed for use in cutting controlled substances; separation gins and sifters used, intended for use, or designed for use in removing twigs and seeds from, or in otherwise cleaning or refining marijuana; blenders, bowls, containers, spoons, and mixing devices used, intended for use, or designed for use in compounding controlled substances; capsules, balloons, envelopes, and other containers used, intended for use, or designed for use in packaging small quantities of controlled substances; metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes, with or without screens, hashish heads or punctured metal holes; water pipes.”

Our interpretation of Health and Safety Code section 11014.5, subdivision (a), is supported by the following authorities, which have interpreted comparable provisions of the Model Act: Bamboo Brothers v. Carpenter (1982) 133 Cal.App.3d 116, 121 [183 Cal.Rptr. 748] [interpreting a Santa Barbara County, California ordinance patterned after the Model Act]; Florida Businessmen etc. v. City of Hollywood (11th Cir. 1982) 673 F.2d 1213, 1216 [interpreting State of Florida and City of Hollywood, Florida, statute and ordinance, respectively, patterned after the Model Act]; Tobacco Accessories, etc. v. Treen (5th Cir. 1982) 681 F.2d 378, 380 [interpreting State of Louisiana law patterned after Model Act]; Levas and Levas v. Village of Antioch, III. (7th Cir. 1982) 684 F.2d 446, .449 [interpreting Village ordinance patterned after Model Act]; Casbah, Inc. v. Thone (8th Cir. 1981) 651 F.2d 551, 555-556 [interpreting State of Nebraska law based on Model Act].
See, also, (1982-1983) 14 Pacific L.J. 541, at p. 542, wherein it is stated: “Chapter 1278 [section 11014.5, subdivision (a)] defines drug paraphernalia as all equipment, products, and materials of any kind designed or marketed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repacking, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance. Furthermore, Chapter 1278 declares a nonexhaústive list of items that are to be considered drug paraphernalia . . . .” (Italics added; fns. omitted.)

 The defense testimony indicates that only portions of four of the thirteen lots of seized items were allegedly not in plain view.

 The burden remains with the People to establish by a preponderance of the evidence that Officer Steele had probable cause to believe that the items seized were in fact “drug paraphernalia” within the meaning of Health and Safety Code section 11014.5. (People v. Superior Court (Bowman) (1971) 18 Cal.App.3d 316 [95 Cal.Rptr. 757]; People v. James (1977) 19 Cal.3d 99, 106, fn. 4 [137 Cal.Rptr. 447, 561 P.2d 1135].)

 See Cohen v. Superior Court (1970) 5 Cal.App.3d 429, 435 [85 Cal.Rptr. 354]; People v. Superior Court (Thomas) (1970) 9 Cal.App.3d 203, 210-211 [88 Cal.Rptr. 21]; cf. McQuillan v. Appellate Department (1977) 71 Cal.App.3d 543, 546 [139 Cal.Rptr. 514],